UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LARRY M. KIMMEL,                    )
                                    )
              Plaintiff,            )
                                    )
         v.                         )    No.  4:07CV1866 DJS
                                    )                    (FRB)
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
              Defendant.            )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal for review of an adverse ruling by the Social Security Administration.  All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

**I.  Procedural History**

On July 26, 2005, plaintiff Larry M. Kimmel filed an application for Disability Insurance Benefits (DIB) pursuant to Title II, 42 U.S.C. §§ 401, et seq., in which he claimed that he became disabled and unable to work on February 9, 2005.  (Tr. 62-66.)  On initial consideration, the Social Security Administration denied plaintiff's application for benefits.  (Tr. 23, 45-49.)  On April 26, 2006, a hearing was held before an Administrative Law Judge (ALJ) at which plaintiff testified.  A vocational expert also testified at the hearing.  (Tr. 346-88.)  On March 28, 2007, the ALJ issued a decision denying plaintiff's claim for benefits.  (Tr. 10-22.)  On August 27, 2007, upon consideration of additional

- 1 -

evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 2-6.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Plaintiff's Testimony</u>

At the hearing on April 26, 2006, plaintiff testified in response to questions posed by the ALJ.

At the time of the hearing, plaintiff was forty-seven years of age. (Tr. 351.) Plaintiff is married and has no children. (Tr. 362.) Plaintiff stands six feet, eight inches tall and weighs 255 pounds. (Tr. 364, 374.) Plaintiff has earned credits toward an associate's degree. (Tr. 351.)

In his Vocational Report, plaintiff reported that from June 1989 to May 1992, he worked as a sales consultant in relation to water and waste water projects. From November 1994 to June 1997, plaintiff was employed as a work program teacher at a facility for functionally disabled adults. From August 1997 to June 2001, plaintiff worked as a security consultant in relation to home and business security systems. From August 2002 to February 2005, plaintiff worked as a loan officer for a mortgage company. (Tr. 116-22.) Plaintiff testified that he left his employment as a loan officer because of back pain and difficulty with his knees and right hip. (Tr. 351-52.)

Plaintiff testified that he had been advised by his physicians that he has damage to his spine in the form of annular

tears, degenerative disc disease and arthritis. (Tr. 371.) Plaintiff testified that he has received treatment for pain in his back and neck for approximately six years, but that his musculoskeletal condition was aggravated by a motor vehicle accident in which he was involved in September 2003. (Tr. 357, 370.) Plaintiff testified that his treatment has included medication, steroid injections, physical therapy, acupuncture, rest, heat, and facet denervation, but that only oral medication has provided significant relief. (Tr. 357.) Plaintiff testified that he experiences fatigue as a side effect of his medication, and that he takes multiple naps daily on account of such fatigue with such naps lasting from half-an-hour to three hours. Plaintiff testified that his medication causes everything to slow down, including his mental alertness. (Tr. 360.)

Plaintiff testified that since February 2005, he has experienced a sharp, stabbing pain in the cervical and thoracic regions of the spine. Plaintiff testified that the pain in the lumbar area of the spine is a dull, aching-type of pain. (Tr. 357-58.) Plaintiff testified that when he drives, he experiences pain in all regions of his spine. (Tr. 358.) Plaintiff testified that although he takes prescribed medication for his pain, he is never pain free. Plaintiff testified that with his medication, he typically experiences pain up to a level seven on a scale of one to ten. (Tr. 358-59.) Plaintiff testified that his pain may sometimes be as low as a level three, but that such a level is an exception rather than the norm. (Tr. 359.) Plaintiff testified

that he is never able to spend an eight-hour period at home without lying down to treat his pain. (Tr. 372.) Plaintiff testified that the pain is not so severe such that his cognitive functioning is affected, although plaintiff testified that he sometimes experiences confusion. (Tr. 371.)

Plaintiff testified that he has had knee problems since he was twelve years of age and that he has had two surgeries performed on his right knee. Plaintiff testified that he experiences pain, discomfort and swelling in the knee and that sometimes the knee will give out. (Tr. 361.) Plaintiff testified that physical examinations have showed him to have trigger points in the cervical area, the thoracic area and in the right knee. (Tr. 377.)

Plaintiff testified that he suffers from sleep apnea and currently uses a CPAP machine for the condition. Plaintiff testified that he awakens three to four times a night and sometimes has difficulty going back to sleep. (Tr. 362.)

Plaintiff testified that he also experiences hand tremors which cause him to make errors while working on the computer and also cause him to spill his coffee. Plaintiff testified that medication has helped the tremors with respect to the associated sensation felt in his arms, but that he nevertheless continues to experience visible shaking. (Tr. 366-67.)

Plaintiff testified that he sees a psychiatrist because of the chronic pain and depression brought on by his inability to continue working and to produce. (Tr. 361-62.) Plaintiff

- 4 -

testified that he is being treated for depression with medication and therapy. (Tr. 362.)

As to his daily activities, plaintiff testified that he vacuums three times a week. Plaintiff testified that the repetitive back-and-forth motion of vacuuming aggravates his back pain and that he must sit between five or ten-minute intervals to relieve the pain. Plaintiff testified that he does not do the dishes or laundry because of the bending and overhead reaching involved which aggravates his pain. Plaintiff testified that his wife cooks but that he may microwave a sandwich for lunch. Plaintiff testified that his wife does the grocery shopping and that he will only rarely help when his wife is busy with her work. Regarding yard work, plaintiff testified that he has a riding lawn mower and that it takes him up to an hour-and-a-half to mow his lawn which is less than one-third of an acre. Plaintiff testified that while mowing, he stops and gets off of the mower at least three or four times. Plaintiff testified that he spends most of his day watching television and that he works on the computer checking e-mail and playing computer games. Plaintiff testified that he can sit as his computer for up to thirty minutes. Plaintiff testified that keeping his knees bent and the motion of leaning forward and looking down while on the computer aggravates his pain. (Tr. 365.) Plaintiff testified that, during the summer, he goes out on a pontoon boat three times a week and spends about an hour on the boat. Plaintiff testified that he usually drives the boat but is able to get up and walk around during the trips.

(Tr. 367.)  Plaintiff testified that he is a member of the board of directors of the homeowners association which requires him to attend meetings once a month and to have contact with other board members.  (Tr. 367-68.)

As to his exertional abilities, plaintiff testified that the walk to his mailbox, which is about 100 feet on a slight incline, causes him to start to feel problems in his knees and hip. Plaintiff testified that he can stand for about fifteen minutes. (Tr. 368.)  Plaintiff testified that he is able to carry firewood weighing about fifteen pounds, but not repetitively.  (Tr. 368-69.) Plaintiff testified that within the past six months, he has lifted a forty-pound bag of salt for his water softener although it aggravated his pain.  Plaintiff testified that he believed he could loosen the lug nuts on the wheel of a car if he had to change a flat tire.  (Tr. 374.)  Plaintiff testified that he can sit for thirty to forty-five minutes in an office-type chair if he positions his body to minimize his discomfort.  (Tr. 369, 378.) Plaintiff testified that he is very careful with his posture so as not to aggravate his pain.  (Tr. 360.)  Plaintiff testified that driving longer than fifteen minutes or turning his body the wrong way aggravates his pain and causes his pain level to increase. (Tr. 359.)  Plaintiff testified that he can drive for thirty minutes to an hour, depending upon the level of discomfort he is experiencing at the beginning of the drive.  (Tr. 378.)  Plaintiff testified that he was currently experiencing pain at a level five after sitting twenty-five minutes at the hearing.  (Tr. 369, 371.)

B.  Testimony of Vocational Expert

Michael Brethauer, a vocational expert, testified at the hearing in response to questions posed by the ALJ.

The ALJ first asked Mr. Brethauer to assume an individual with plaintiff's complaints and with pain and limitations as described by plaintiff necessitating at least two naps a day for half-an-hour to three hours each. Mr. Brethauer testified that an average employee needing such an accommodation would generally not be able to maintain employment on a long term basis. (Tr. 381-82.)

The ALJ then asked Mr. Brethauer to assume an individual with diagnoses of degenerative disc disease of the cervical spine and action tremor of the upper extremities, who had the

> capacity to lift 50 pounds occasionally, 25 pounds frequently but could only stand and walk with normal breaks about two hours in an eight-hour workday. Didn't find any postural limitations, and didn't find any environmental limitations except had to avoid concentrated exposure to a hazardous work setting around open moving, dangerous machinery or unprotected heights. And that was basically because of his pain medication. I would also add to the environmental limitations that an individual who complains of muscular skeletal [sic] pain and has degenerative changes in the back normally should avoid concentrated exposure to extreme cold and vibration of the body, both of which are known to aggravate musculoskeletal pain.

(Tr. 382.)

Mr. Brethauer testified that such a person could perform plaintiff's past work as a loan officer, DOT 182.267-018, as such work is performed in the open labor market and as described in the

DOT, but not as plaintiff actually performed it in the past. Mr. Brethauer also testified that such a person could perform plaintiff's past work as a security consultant, DOT 189.167-054, as such work is described in the DOT and as performed by plaintiff. Finally, Mr. Brethauer testified that such a person could perform plaintiff's past work as a supervisor in a sheltered workshop, DOT 187.134-010, as such work is described in the DOT and as performed by plaintiff. (Tr. 383.)

The ALJ then asked Mr. Brethauer to assume that in addition to the conditions set out in the second hypothetical, the individual "also needs an alternate sit-stand job. He can't stand for longer than 15 minutes at a time before being allowed to sit. Can't sit for longer than 45 minutes at a time before being allowed to stand." (Tr. 383.) Mr. Brethauer testified that such a person could perform the jobs of loan officer and security consultant as described in the DOT, but could not perform the jobs as performed by plaintiff in the past. (Tr. 384.) As to the job of loan officer, Mr. Brethauer testified that 8,000 such jobs exist in the State of Missouri, with fifty times that amount existing in the national economy. (Tr. 384-85.) As to the job of security consultant, Mr. Brethauer testified that 400 such jobs exist in the State of Missouri, with fifty times that amount existing in the national economy. (Tr. 384.)

The ALJ then asked Mr. Brethauer to further assume the individual to have "an essential tremor that would preclude him from engaging in work where he had to fine finger manipulate such

as working with a screwdriver and putting screws into some material[.]" (Tr. 385.) Mr. Brethauer testified that such an additional condition would have the effect of eliminating all of plaintiff's past jobs except that of security consultant, but that the number of such security consultant jobs would be reduced by five to ten percent. (Tr. 385, 386.) Mr. Brethauer also testified that such a person could perform other work in certain packaging jobs, with 1,000 such jobs existing in the State of Missouri and 50,000 nationally. (Tr. 385.)

### III. Medical Records[1]

On December 7, 2000, plaintiff visited Neurologist John J. O'Keefe for evaluation of hand tremors. Plaintiff also complained of neck pain radiating to his right scapular region and reported to Dr. O'Keefe that a recent MRI examination performed in Texas showed herniated nucleus pulposus. No other significant medical problems were reported. Plaintiff's current medications

---

[1]Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council. This evidence consists of treating psychiatrist Dr. Croughan's treatment notes and reports from January 2006 to July 2007, treating physician Dr. O'Keefe's treatment notes from January 2006 to March 2007, an August 2006 report from examining physician Dr. Feinberg, and a June 2007 report from vocational counselor James England. (Tr. 265-345.) The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

were noted to include Propranolol,[2] Vicodin,[3] Soma,[4] and Vioxx.[5]
Review of systems was unremarkable. Physical examination showed
tenderness about the cervical spine, spasm and limitation of
motion. Muscle strength, bulk and tone were normal in all four
extremities. Sensory examination was normal. Finger-to-nose
testing showed action tremor of moderate severity. All reflexes
was 2+ bilaterally. An EEG performed that same date was normal.
A Bilateral Brainstem Auditory Evoked Response Study performed that
same date was likewise normal. An EMG of the masseter and
orbicularis oris muscles was normal. Upon conclusion of the
examination, Dr. O'Keefe diagnosed plaintiff with essential tremor
and cervical herniated nucleus pulposus by history. Plaintiff's
dosage of Propranolol was adjusted and plaintiff was instructed to
follow up in two months. (Tr. 238-44.)

An MRI of plaintiff's lumbar spine performed on August
27, 2003, in response to plaintiff's complaints of low back pain
showed paracentral disc protrusion in association with an annular

---

[2]Propranolol is used to prevent migraine headaches and
tremors. Medline Plus (last reviewed Aug. 1, 2007)<http://
www.nlm.nih.gov/medlineplus/druginfo/meds/a682607.html>.

[3]Vicodin (hydrocodone) is indicated for the relief of moderate
to moderately severe pain. Physicians' Desk Reference 1629-30
(55th ed. 2001).

[4]Soma (carisoprodol) is indicated as an adjunct to rest,
physical therapy, and other measures for the relief of discomfort
associated with acute, painful musculoskeletal conditions.
Physicians' Desk Reference 3252 (55th ed. 2001).

[5]Vioxx is indicated for the relief of signs and symptoms of
osteoarthritis and for the management of acute pain. Physicians'
Desk Reference 2049-50 (55th ed. 2001).

tear or fissure at L4, and a right paracentral disc protrusion at L5. (Tr. 245.)

An x-ray taken of plaintiff's cervical spine on September 8, 2003, showed no compression fracture. Spurring and right lateral spur at C5-6 was noted. (Tr. 264.)

Plaintiff visited Dr. R. Peter Mirkin for an orthopedic spine consultation on September 22, 2003, in relation to a motor vehicle accident in which he was involved on September 5, 2003. Plaintiff complained of pain in his neck, right posterior shoulder and low back. Plaintiff reported to Dr. Mirkin that he had a history of back problems and had been taking narcotic medication on a daily basis for at least three years. Physical examination showed minimal tenderness of the cervical spine and mildly positive Spurling sign.[6] Deep tendon reflexes were noted to be intact in the biceps, triceps and brachioradialis. Mild tenderness was noted about the lumbar spine. Plaintiff was able to heel and toe walk. Plaintiff could squat and rise from a squat position. Straight leg raising was negative. Motor and sensory examination was noted to be intact. Dr. Mirkin noted x-rays to show plaintiff to have mild cervical spondylosis. (Tr. 258.) Dr. Mirkin opined that plaintiff had cervical strain and lumbar strain, pre-existing degenerative spine disease, and narcotic addiction/dependence. Dr. Mirkin

---

[6]For the "Spurling test," the head is bent forward and to the sides. Increased pain or numbness experienced while the health care provider provides slight downward pressure on the top of the head is indicative of cervical radiculopathy. Medline Plus (updated May 12, 2008)<http://www.nlm.nih.gov/medlineplus/ency/article/000442.htm>.

opined that plaintiff could work with a twenty-pound restriction and a driving restriction of not more than one hour without a rest. Dr. Mirkin recommended aggressive therapy. Dr. Mirkin concluded that he could "not see why this patient has been on long term narcotic use and it may be time for him to consider getting off this." (Tr. 258-59.)

An MRI taken of plaintiff's cervical spine on September 23, 2003, in relation to plaintiff's complaints of neck pain and right shoulder pain showed C5-C6 left-sided spurs and soft discogenic protrusion affecting the dura and the exiting root. No evidence to suggest fracture was observed. (Tr. 260.)

On September 29, 2003, Physical Therapist Ray Bauer of ProRehab provided a report to Dr. Mirkin of plaintiff's progress in physical therapy relating to plaintiff's diagnosed conditions of cervical and lumbar strain. It was noted that plaintiff had been in a work-related motor vehicle accident from which he suffered a neck injury. Mr. Bauer reported to Dr. Mirkin that plaintiff had participated in physical therapy three times since the last physician visit and had acknowledged some improvement with therapy but continued to complain of neck discomfort aggravated by increased driving. (Tr. 263.)

Plaintiff returned to Dr. Mirkin on September 29, 2003, and complained of persistent pain in his neck and that he could not drive long distances. Physical examination showed plaintiff to have full range of motion, intact deep tendon reflexes, and intact motor and sensory exam. Dr. Mirkin instructed plaintiff to

continue with therapy and to maintain the previously imposed restrictions. Plaintiff was instructed to return for follow up in a couple of weeks with the hope that he could return to full work activity at that time. (Tr. 257.)

On October 13, 2003, Mr. Bauer reported to Dr. Mirkin that plaintiff continued to improve with physical therapy. It was noted that plaintiff continued to report symptoms initiated with driving, but that the onset of such symptoms was now delayed. (Tr. 262.)

Plaintiff returned to Dr. Mirkin on October 13, 2003, and reported that he no longer had arm pain but that he continued to have persistent neck pain and wanted to continue therapy. Plaintiff advised Dr. Mirkin that he did not want to return to full work. Physical examination showed plaintiff to walk with an upright gait. Plaintiff had ninety percent of full range of motion of the cervical spine. Deep tendon reflexes were intact as well as motor and sensory exam. Dr. Mirkin opined that it was safe for plaintiff to work with the previously imposed restrictions. Dr. Mirkin referred plaintiff for three more weeks of therapy after which plaintiff could hopefully return to full work. (Tr. 256.)

On November 10, 2003, Mr. Bauer reported to Dr. Mirkin that plaintiff showed improvement with therapy but continued to experience an aggravation of symptoms with driving. Minimal stiffness was noted about the lower cervical/upper thoracic spine. It was noted that plaintiff had reported to Mr. Bauer that his improvement in symptoms was short-lived. (Tr. 261.)

Plaintiff returned to Dr. Mirkin on November 10, 2003, and complained of persistent pain down his right side. Plaintiff advised Dr. Mirkin that he was "quite certain" he could not return to full work. Physical examination showed full range of motion. Neurological examination was intact as well as motor and sensory exam. Plaintiff experienced no pain down the left side. Dr. Mirkin noted the MRI to show a small protrusion entirely on the left. Dr. Mirkin advised plaintiff that he did not think surgery would likely help and that all had been done to help him. Dr. Mirkin opined that plaintiff had reached maximum medical improvement. Dr. Mirkin reported that he saw no reason for plaintiff not to be able to return to work, and all restrictions were removed. Plaintiff advised Dr. Mirkin that he would like to obtain a second opinion. (Tr. 255.)

Plaintiff visited Dr. O'Keefe on March 8, 2004, for follow up in relation to essential tremor, cervical spondylosis and lumbar disc disease. Plaintiff's current medications were noted to include Atenolol,[7] Vioxx, Soma for muscle spasm, diazepam[8] for

---

[7]Atenolol is indicated for the treatment of hypertension and chest pain, and is also sometimes used to prevent migraine headaches. <u>Medline Plus</u> (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684031.html>.

[8]Diazepam (Valium) is used to relieve anxiety, muscle spasms and seizures. <u>Medline Plus</u> (last reviewed Aug. 1, 2007) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682047.html>.

muscle spasm, Lorcet[9] for pain, and Fluoxetine.[10]  Plaintiff
reported that his bilateral upper extremity action tremor was well
controlled by his current dose of Atenolol.  Plaintiff reported no
side effects from his medication other than night sweats with
imipramine.[11]  Plaintiff continued to complain of neck pain
radiating to his right shoulder and scapular region, down his right
arm, and into the dorsum of his right hand.  Plaintiff reported
there to be no upper extremity numbness or weakness.  Plaintiff
also complained of low back pain radiating to his left buttock and
posterior thigh.  Plaintiff reported there to be no lower extremity
numbness or weakness.  Plaintiff reported his spirits to have been
good.  Dr. O'Keefe noted there to be no significant changes since
his last examination of plaintiff in December 2000 other than as
noted.  Cervical and lumbar tenderness, spasm and limitation of
motion were noted.  Straight leg raising was normal.  Muscle
strength, bulk and tone were normal in all four extremities.
Sensory examination was normal.  Finger-to-nose testing showed
action tremor of moderate severity.  Laboratory studies were noted
to be normal.  Upon conclusion of the examination, Dr. O'Keefe

---

[9]Lorcet contains hydrocodone and acetaminophen to relieve
moderate to moderately severe pain.  Medline Plus (last revised
Oct. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/
medmaster/a601006.html>.

[10]Fluoxetine (Prozac) is indicated for the treatment of
depression and for the treatment of obsessions and compulsions in
patients with obsessive-compulsive disorder.  Physicians' Desk
Reference 1127-28 (55th ed. 2001).

[11]Imipramine is used to treat depression.  Medline Plus (last
revised Aug. 1, 2007)< http://www.nlm.nih.gov/medlineplus/druginfo/
medmaster/a682389.html>.

diagnosed plaintiff with essential tremor, cervical spondylosis, lumbar disc disease, and depression. Plaintiff was instructed to continue with his medications and to return for follow up in three months. (Tr. 230-37.)

Plaintiff returned to Dr. O'Keefe on June 7, 2004, who noted there to be no significant changes since the last examination. Laboratory tests performed in the office that same date were normal. Dr. O'Keefe continued in his diagnoses of plaintiff and instructed plaintiff to continue with his medications and to follow up in three months. (Tr. 222-29.)

Nerve conduction studies performed on plaintiff's plantar nerve on September 17, 2004, were normal. (Tr. 221.)

Plaintiff returned to Dr. O'Keefe on October 21, 2004. No significant physical changes were noted. Plaintiff reported that he had been troubled by depression recently in relation to caring for his ill father. Plaintiff denied suicidal ideation, early morning waking or loss of appetite. Dr. O'Keefe noted plaintiff to appear mildly depressed. Laboratory tests performed in the office that same date were normal. Dr. O'Keefe continued in his diagnoses of plaintiff and instructed plaintiff to continue with his medications, with an increase in his dosage of Fluoxetine. Plaintiff was instructed to return in four months for follow up. (Tr. 214-20.)

On November 2, 2004, plaintiff visited Dr. John E. Tessier for a second opinion regarding his neck, back and arm pain. Plaintiff reported having continued neck pain, pain radiating down

into the rhomboids, pain around the right shoulder, pain extending down into the forearm and right ring finger, and low back pain extending down to the knee. Dr. Tessier reviewed the September 2003 x-rays of the lumbar and cervical spine as well as the September 2003 MRI of the cervical spine. Dr. Tessier also noted an additional MRI taken in August which showed a paracentral disc herniation in association with an annular tear at L4. A disc bulge at L4 was also noted. Plaintiff reported to Dr. Tessier that epidural steroid injections had been administered and that he had participated in physical therapy, but that he obtained only short-term relief therefrom. Plaintiff reported that he had previously been under the care of a pain management physician in Houston, Texas, before relocating. Plaintiff reported his current medications to include Celebrex,[12] Valium, Soma, and Vicodin. Physical examination showed plaintiff to have very tight hamstrings. Plaintiff was able to go up on his heels and toes with forward flexion. Reflexes were noted to be symmetric at the knees and ankles. Neither focal strength deficit nor sensory deficit were noted in the lower extremities. Straight leg raising was negative. Plaintiff had no restriction in his range of motion about the knees and hips. Minimal restriction was noted with cervical rotation and side bending. Some tenderness was noted about the lumbosacral junction with palpation. Some complaints

---

[12]Celebrex (celecoxib) is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis and ankylosing spondylosis. Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699022.html>.

were noted about the lumbosacral paravertebral area as well as about the rhomboids at the upper back. Strength and reflexes were noted to be intact in the upper extremities, including the wrists and hands. Upon conclusion of the examination, Dr. Tessier advised plaintiff that he would obtain an opinion from a spine physician regarding the availability of surgery as an option, as well as an opinion regarding whether additional therapy or other treatment should be considered. (Tr. 252-53.)

On November 16, 2004, plaintiff visited Dr. Lukasz J. Curylo for consultation. Plaintiff complained of neck pain with radiation down into the parascapular area on the left side as well as to both shoulders. Plaintiff also complained of occasional pain going down to the right fifth digit. A secondary complaint of chronic low back pain was also noted, which plaintiff reported to have experienced since 1998. Plaintiff denied any significant leg pain. Plaintiff reported his neck pains to have begun in September 2003 in relation to a motor vehicle accident. Plaintiff reported the pain to be severe with constant aggravation by coughing, straining, neck positions, and bending forward. Plaintiff reported the pain to be relieved with sitting and lying down. Plaintiff reported that he had no chiropractic or physical therapy treatments, but that he has had epidural and trigger point injections without much improvement. Dr. Curylo noted plaintiff's past medical history to be significant for migraine headaches, nephrolithiasis, osteoarthritis, depression, insomnia, and essential tremor. Plaintiff denied any current numbness, weakness

or paresthesias. Plaintiff complained of some current sleep disturbances and depression. Plaintiff's current medications were noted to include hydrocodone, carisoprodol, Celebrex, Fluoxetine, and Atenolol. Physical examination showed plaintiff to have several sore/tender trigger points predominantly at the spinal processes at C7-T1 as well as paraspinally on the left side at the level of the T7-T8 vertebral bodies. Plaintiff had slightly decreased pinprick sensation in the left S1 dermatome. Otherwise, plaintiff's physical examination was essentially within normal limits. Dr. Curylo noted plaintiff's 2003 radiographic test results as well as lumbar x-rays taken November 2, 2004, which showed mild degenerative changes at the L4-5 and L5-S1 level with narrowing of the posterior disc space. Upon conclusion of the examination, Dr. Curylo opined that plaintiff had chronic neck, midback and low back sprain, with no detection of any significant radiculopathy or myelopathy except for slight numbness in the left S1 dermatome. Dr. Curylo opined that the degenerative changes noted were not likely related to the accident. Dr. Curylo determined to order new MRI studies of the cervical, thoracic and lumbar spine and advised plaintiff that he would base any further treatment thereon, although it appeared likely that plaintiff would benefit from continued conservative care. (Tr. 249-51.)

Plaintiff returned to Dr. Curylo on December 6, 2004. Dr. Curylo noted there to be no significant change in plaintiff's symptoms since his last visit. Dr. Curylo reviewed results from MRI's taken on November 24, 2004, which showed degenerative disc

disease at the C5-6 level with central disc protrusion noted to be mild. No stenosis was observed. Dr. Curylo noted there to be evidence of desiccation of the L4-5 and L5-S1 disc with central protrusions but no significant stenosis or disc herniations. The thoracic MRI was normal. No other pathological, bony or soft tissue lesions were noted. Plaintiff was diagnosed with chronic neck and midback sprain after motor vehicle accident without any significant intrinsic spinal cord compression. Dr. Curylo instructed plaintiff to undergo chiropractic treatments as well as possible epidural injections. Dr. Curylo advised plaintiff that there were no surgical options available at the time and that he would see plaintiff in the future on an as-needed basis. (Tr. 247.)

Plaintiff returned to Dr. O'Keefe on February 8, 2005, for follow up of essential tremor, cervical spondylosis and low back pain. Dr. O'Keefe noted there to be no significant changes since the last examination. Plaintiff reported that he continues to experience mild depression. Laboratory tests performed in the office that same date yielded normal results. Dr. O'Keefe continued in his diagnoses of essential tremor, cervical spondylosis, lumbar disc disease, and depression and instructed plaintiff to continue with his medications. Plaintiff was to return in four months for follow up. (Tr. 208-13.)

Plaintiff visited Dr. Thomas F. Lieb on March 24, 2005, for follow up on a recent cervical epidural steroid injection which had been administered one week prior. Plaintiff reported that he

had obtained wonderful relief for about twenty-four hours. Plaintiff reported that his relief continued to be "pretty good" until he returned to physical therapy at which time something "seemed to stir it up." Dr. Lieb opined that plaintiff needed to continue with therapy. Plaintiff was instructed to continue with his medication as directed by Dr. O'Keefe. (Tr. 180.)

On May 23, 2005, plaintiff returned to Dr. O'Keefe and reported that he had obtained some transient relief in his neck and right upper extremity pain from a cervical epidural steroid injection. It was noted that trials of cervical traction and physical therapy aggravated his neck and right upper extremity pain. Plaintiff reported low back pain without radiation to either lower extremity. Plaintiff reported that he has been mildly depressed. Physical examination remained unchanged. Laboratory tests performed that same date were normal. Dr. O'Keefe continued in his diagnoses of plaintiff and instructed plaintiff to continue with his medications. Plaintiff was instructed to return in four months for follow up. (Tr. 202-07.)

On May 26, 2005, plaintiff visited Dr. Sam Page of Pain Management Services for evaluation regarding medial branch radio-frequency ablation. Dr. Page noted plaintiff's chief complaint to be of neck pain in the cervical area which radiates to the shoulders and arm. Plaintiff also complained of low back pain without radiation. Dr. Page noted plaintiff's previous treatment to include physical therapy, cervical epidural injections and cervical facet injections, with plaintiff obtaining the most relief

from facet injections.  Plaintiff reported his pain to be constant, severe and getting worse.  Plaintiff reported his pain to be associated with tingling, nausea/vomiting, and bowel/bladder dysfunction.  Plaintiff reported his pain to worsen with coughing, sneezing, exercise, walking, sexual activity, cold, driving, moving from sitting to standing, and stress/fatigue.  Plaintiff reported that sitting, lying down, heat, medication, ice, and relaxation seemed to relieve the pain.  Review of systems showed plaintiff to report weight or appetite changes, blurred vision, diarrhea, dizziness, depression, mood swings, and anxiety.  Plaintiff denied any disturbed sleeping habits, seizures, numbness, tremors, or additional joint or muscle limitation.  Plaintiff reported that he could not lift heavy objects from the floor but could manage if they were conveniently located on a table.  Plaintiff reported that he could sit for an unlimited time in his favorite chair and stand for an unlimited time but experiences extra pain.  Plaintiff reported that he obtains less than six hours of sleep due to pain.  Plaintiff reported that he is able to manage journeys longer than two hours despite his pain being "bad."  Physical examination showed plaintiff to have full range of motion about his neck with no cervical spine tenderness to palpation.  No myofascial trigger points were detected.  Significant pain over the cervical facet joints on the right was noted, reproducing a lot of pain.  Modest pain over the cervical facet joints on the left was noted.  Neurological examination was normal.  Psychiatric examination showed plaintiff's mood to be appropriate with no signs of

depression or undue anxiety exhibited. Dr. Page diagnosed plaintiff with cervical spondylosis and thoracic and lumbar disc disease and recommended that plaintiff undergo cervical medial branch radiofrequency ablation. Dr. Page recommended that plaintiff consolidate his pain medications and further recommended that plaintiff take morphine[13] and Zanaflex[14] instead of Soma. Dr. Page referred plaintiff for a psychiatric evaluation, noting the interaction and interdependence of depression and chronic pain. Plaintiff was instructed to return in two weeks for follow up. (Tr. 197-200.)

Plaintiff returned to Dr. Page on June 20, 2005, and reported no change in his pain. Plaintiff reported having no adverse drug reactions. Physical examination showed plaintiff to have full range of motion about the neck, with tenderness throughout the trapezius and cervical paraspinal muscles on the right. Tenderness over the facet joints on the right was noted with direct palpation. Dr. Page noted plaintiff's affect to be flat and that plaintiff appeared to be depressed. Plaintiff underwent right-sided cervical facet denervation. Plaintiff was instructed to stop his hydrocodone and Soma and was prescribed Zanaflex and MS Contin (morphine). Plaintiff was instructed to

---

[13]Morphine is used to relieve moderate to severe pain and works by changing the way the body senses pain. Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682133.html>.

[14]Zanaflex (tizanidine) is used to relieve the spasms and increased muscle tone caused by multiple sclerosis, stroke, or brain or spinal injury. Medline Plus (last revised Jan. 1, 2008) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601121.html>.

return in three weeks for follow up.  (Tr. 194-96.)

Plaintiff visited Psychiatrist Jack L. Croughan on July 1, 2005, upon referral from Dr. Page.  Plaintiff reported his history of back and neck pain which was aggravated with his involvement in a motor vehicle accident in September 2003. Plaintiff likewise reported his history of medications.  Plaintiff reported that he visited various doctors for pain management and obtained only brief, limited relief.  Plaintiff reported that his father became very ill in August 2004 and died in November 2004. Plaintiff reported that until that time, he could continue to work and function with medication and "sheer will" but that the latter lost out to grief.  It was noted that plaintiff was the executor of his father's estate.  Plaintiff reported that upon his return to work, his interest and drive had decreased and that he "just didn't have it."  Plaintiff reported that he then went on medical leave on February 9, 2005.  Plaintiff reported that he was currently taking Prozac which helped him in the beginning.  As for symptoms of depression, Dr. Croughan noted plaintiff to have decreased mood, concentration and interests.  Plaintiff had a flat affect. Plaintiff denied suicidal ideation.  Plaintiff's insight and judgment were noted to be normal.  Plaintiff was diagnosed with depression and adjustment disorder and was instructed to continue with his medications.  Plaintiff was assigned a current Global Assessment of Functioning (GAF) score of 55.[15]  Plaintiff was

_____
[15]A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness."  A GAF score of 51 to 60 indicates moderate

instructed to return in four weeks for follow up.  (Tr. 187-90.)

Plaintiff returned to Dr. Page on July 14, 2005, and reported the facet denervation to have helped some but that his pain was currently worsening.  Plaintiff also complained of mid and low back pain.  Dr. Page noted plaintiff to be profoundly depressed and that his depression had only slightly improved after visiting Dr. Croughan.  Plaintiff reported that the medications provided at the last appointment provided no relief and caused him to experience headaches and constipation.  Physical examination showed full range of motion about the neck with shoulder pain upon rotation.  The cervical spine was nontender to palpation.  Tenderness was noted about the trapezius muscles bilaterally.  The thoracic and lumbar spine were nontender to palpation.  Psychiatric examination showed plaintiff's mood to be depressed and his affect flat.  Plaintiff appeared to Dr. Page to be depressed.  Dr. Page continued in his diagnoses of cervical spondylosis and depression. Plaintiff was instructed to increase his dosage of Cymbalta[16] and to continue with Dr. Croughan.  Plaintiff reported that the morphine did not help him much.  Dr. Page instructed plaintiff to

---

symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).

[16]Cymbalta (duloxetine) is used to treat depression and generalized anxiety disorder.  It is also used to treat pain caused by fibromyalgia.  Medline Plus (last revised Feb. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a604030.html>.

discontinue morphine, and Oxycontin[17] was prescribed.  Plaintiff was advised that his pain would not improve significantly until his depression was adequately controlled.  Plaintiff was instructed to return in one month.  (Tr. 192-93.)

Plaintiff returned to Dr. Croughan on July 18, 2005, who noted plaintiff to have misunderstood his previous instruction regarding medication by decreasing his Prozac on July 2, and then discontinuing it entirely on July 14.  Dr. Croughan noted this withdrawal to have happened too quickly.  Dr. Croughan instructed plaintiff to continue with Cymbalta.  (Tr. 186.)

On August 12, 2005, plaintiff visited Dr. Page and complained of "all over body pain."  Dr. Page noted plaintiff not to have obtained improvement with the ablation procedure. Plaintiff's medical and treatment history was reviewed.  Plaintiff reported that the Cymbalta was not currently helping him as much as it had initially.  Plaintiff reported his pain to be worsening and constant.  Dr. Page noted plaintiff to have obtained partial relief from medications at the last office visit but that such relief was temporary.  Plaintiff reported that his medications caused him to experience side effects such as sleepiness, headaches and constipation.  Physical examination showed plaintiff to have full range of motion about the neck.  The cervical and thoracic spine were nontender to palpation.  Dr. Page noted there to be distinct

---

[17]Oxycontin is indicated for the management of moderate to severe pain where use of an opioid analgesic is appropriate for more than a few days.  Physicians' Desk Reference, 2697-98 (55th ed. 2001).

trigger points involving the thoracic paraspinous muscles and trapezius muscles bilaterally. Tenderness was noted throughout all the muscles of the neck. Examination of the lumbar spine was essentially normal, with negative straight leg raising. Dr. Page noted there to be lumbar paraspinous muscle tenderness but no distinct trigger points. All reflexes were noted to have decreased since the last examination. Plaintiff retained full muscle strength. Psychiatric evaluation showed plaintiff's affect to be normal and his mood appropriate. Dr. Page observed plaintiff to be depressed but noted plaintiff to be more animated than in the past. Dr. Page diagnosed plaintiff with myofascial neck and upper back pain, cervical spondylosis and major depression. Dr. Page opined that, despite his treatment history, plaintiff was not at an acceptable level of pain control. Dr. Page also opined that plaintiff's major depression was not optimally controlled. Dr. Page instructed plaintiff to increase his dosage of Oxycontin. Dr. Page suggested to plaintiff that he may have reached maximum medical improvement and might pursue disability inasmuch as he would not be able to return to his productive career. Plaintiff was "not very excited about this alternative." Plaintiff was prescribed another round of physical therapy. (Tr. 177-79.)

Plaintiff returned to Dr. Croughan on August 15, 2005, and reported that his pain was increasing and that Dr. Page had recently increased his oxycodone.[18] Plaintiff reported to Dr.

_____

[18]Oxycodone (Percodan) is indicated for the relief of moderate to moderately severe pain. Physicians' Desk Reference 1211-12 (55th ed. 2001).

Croughan that Dr. Page had given him "bad news" that plaintiff was disabled. Plaintiff reported that he was "not ready for this." Plaintiff questioned what would happen to his treatment if he was classified as disabled. Plaintiff reported that Dr. Page recommended physical therapy but plaintiff feared that such therapy aggravated his condition in the past. Plaintiff reported that he felt Cymbalta was helping. Dr. Croughan instructed plaintiff to return in one to four days for a full office visit. Plaintiff was instructed to continue with his medications. (Tr. 185.)

Plaintiff returned to Dr. Croughan on August 15, 2005, and reported that he felt better. Plaintiff reported that he had rested in his chair or in bed and that his pain was more manageable. Plaintiff reported that he is able to take hydrocodone more often than oxycodone and can take it along with Soma, Vioxx and Celebrex. It was noted that plaintiff had been taking hydrocodone and Soma for years from which he obtained relief. Plaintiff reported that he felt that more should be done inasmuch as he is experiencing increased pain. Plaintiff reported his goal to be to "get better" and that he wanted "to be repaired." Dr. Croughan opined that these goals were evident in plaintiff's reaction to Dr. Page's statement that plaintiff was disabled. Plaintiff was instructed to return on August 19 for a full office visit. (Tr. 184.)

Plaintiff returned to Dr. Croughan on August 19, 2005. Plaintiff reported his mood and pain to have improved and stated that "there's hope again." Dr. Croughan instructed plaintiff to

continue with his medication, including Cymbalta, and to return for follow up in two weeks. (Tr. 183.)

On September 2, 2005, plaintiff reported to Dr. Croughan that he was tired of complaining. Dr. Croughan noted plaintiff to continue to take Cymbalta and to experience profuse sweating. It was also noted that plaintiff had gained ten to fifteen pounds during the previous four months. Plaintiff expressed anger at his inability to control his pain and was noted to be very upset with the idea of disability. Plaintiff was instructed to continue with his medications and to return in two weeks for follow up. (Tr. 174.)

Plaintiff returned to Dr. Croughan on September 15, 2005, and complained that he had been more achy, sleepy and tired. Dr. Croughan reviewed plaintiff's numerous medications and stressed to plaintiff that he needed to communicate with Dr. O'Keefe and Dr. Page regarding the medications. Dr. Croughan discussed with plaintiff the potential for dependence on Valium. Plaintiff reported his sleep to be poor and that he had sleep apnea. Plaintiff was instructed to take Lunesta and to increase his dosage of Cymbalta. (Tr. 172-73.)

On September 16, 2005, plaintiff returned to Dr. Page and complained of continued neck pain, although he described the pain as better. Plaintiff reported that he was making progress with Dr. Croughan. Dr. Page noted plaintiff's current medications to include Celebrex, Cymbalta and Oxycontin. Plaintiff reported that his medications caused him to experience side effects such as

sleepiness, constipation, and swelling of the ankles. Plaintiff did not take Miralax as instructed by Dr. Page because he did not want to take another medicine. Plaintiff did not go to physical therapy as instructed by Dr. Page because "he just was not up to it." Physical examination showed plaintiff to have full range of motion about the neck with some tenderness along the facet joints on the right. No posterior spinal tenderness was noted. Some tenderness was noted about the cervical paraspinous muscles and trapezius, but there were no distinct trigger points. Plaintiff had full reflexes and full motor strength. Psychiatric examination showed plaintiff's affect to be flat and his mood to be depressed. Dr. Page continued in his diagnoses of plaintiff and opined that plaintiff needed aggressive treatment for his depression. Dr. Page determined to hold off on physical therapy until plaintiff's depression had optimized. (Tr. 175-76.)

Plaintiff visited Dr. O'Keefe on September 29, 2005, for follow up regarding essential tremor, cervical spondylosis and lumbar disc disease. Dr. O'Keefe noted plaintiff's current medications to include Atenolol, celecoxib, Soma, diazepam, Lorcet, and duloxetine. Plaintiff reported that his current dosage of Atenolol no longer adequately controlled the tremor. Plaintiff complained of neck pain radiating to his right shoulder, right arm, right forearm, and to his right middle, index and ring fingers. Plaintiff reported that this pain was sometimes accompanied by numbness of his right arm and forearm. Plaintiff reported having experienced severe pain over the mid-portion of the thoracic spine

since the last visit.  Plaintiff also complained of low back pain radiating to his right buttock and thigh.  Physical examination showed no kyphosis or scoliosis of the spine.  Cervical, mid-thoracic and lumbar tenderness was noted.  Spasm was noted about the paracervical, parathoracic and paralumbar musculature. Cervical and lumbar motion was limited.  Straight leg raising was normal.  Mental status examination showed plaintiff to be mildly depressed.  Muscle strength, bulk and tone were normal in all four extremities.  Finger-to-nose testing showed action tremor of moderate severity.  Laboratory tests performed that same date were normal.  Dr. O'Keefe diagnosed plaintiff with essential tremor, cervical spondylosis, thoracic disc disease, lumbar disc disease, and depression.  Dr. O'Keefe noted plaintiff to have adverse reactions to imipramine, tizanidine and oxycodone.  Dr. O'Keefe determined for plaintiff to undergo MRI's of the cervical, thoracic and lumbar spines; to increase his dosage of Atenolol; and to continue on his other medications.  Plaintiff was instructed to return for follow up in five months.  (Tr. 151-59.)

Plaintiff returned to Dr. Croughan on September 30, 2005, and reported that he had visited Dr. O'Keefe and was no longer taking oxycodone.  Plaintiff reported, however, that he had experienced the worse pain ever during the past two days. Plaintiff reported that he had no appetite and had lost ten pounds during the previous week.  Dr. Croughan instructed plaintiff to continue with his medications and to return in three or four weeks for follow up.  (Tr. 171.)

On October 7, 2005, H. Ridings, a medical consultant with disability determinations, completed a Physical Residual Functional Capacity Assessment wherein s/he opined that plaintiff could occasionally lift fifty pounds; frequently lift twenty-five pounds; could stand or walk for a total of at least two hours in an eight-hour workday; could sit for a total of about six hours in an eight-hour workday; and had unlimited ability to push and/or pull. Consultant Ridings further opined that plaintiff had no postural, visual or communicative limitations; was unlimited in his ability perform manipulative procedures; and was environmentally limited only in that he should avoid concentrated exposure to hazards due to pain medication. Consultant Ridings opined that a review of the medical evidence showed there to be no significant change in neurological findings since the alleged onset of disability when compared to pre-onset findings. (Tr. 76-83.)

An MRI of the cervical spine performed on October 11, 2005, showed spondylitic changes resulting in the narrowing of the neural foramen at C5-6, left. (Tr. 150.) An MRI of the lumbar spine showed flattening of the normal concave disc at L4 with an annular tear or fissure, and interval development of a dilated aorta. No focal disc herniation was detected. (Tr. 148-49.) An MRI of the thoracic spine showed diffuse disc desiccation effects throughout the thoracic and upper lumbar column, and vertebral endplate irregularity with numerous Schmorl nodes[19] that were not

---

[19]A Schmorl node is a prolapse of the nucleus pulposus through the vertebral body endplate into the spongiosa of the vertebrae. Stedman's Medical Dictionary 1215 (26th ed. 1995).

of recent origin. No evidence of compression deformity or disc herniation was observed. (Tr. 147.)

On October 12, 2005, Psychologist Holly L. Weems completed a Psychiatric Review Technique Form for disability determinations. Dr. Weems opined that plaintiff's depression resulted in mild restrictions of daily activities; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence or pace; with no extended episodes of decompensation. Dr. Weems concluded that plaintiff's mental impairment was not severe. (Tr. 84-96.)

Plaintiff visited Dr. Croughan on December 5, 2005, who noted plaintiff not to be doing well. Plaintiff reported that he was shocked with recent MRI findings which showed "too many black [vertebrae.]" Plaintiff reported that he visited a neurosurgeon who stated that nothing could be done. Plaintiff reported that he no longer sees Dr. Page and that Dr. O'Keefe manages all of his medications. Plaintiff reported that his claim for disability had been denied and figured that he would have to work in some manner or he and his spouse would lose everything. Plaintiff reported that he could not drive even moderate distances. Dr. Croughan discussed plaintiff's exertional abilities with him. Plaintiff stated that he could stand for less than two hours but would experience pain in his neck, low back and knees; and could stand for an additional hour if he could relax and sit for about two hours in between. Plaintiff reported that he could walk for about 200 feet but with pain. Plaintiff was uncertain as to how long he

could remain sedentary, that is, sitting and performing desk work. Dr. Croughan reviewed plaintiff's medications and determined to start plaintiff on Remeron.[20]  Plaintiff was instructed to continue with his other medications as well.  (Tr. 169-70.)

On December 19, 2005, plaintiff reported to Dr. Croughan that he was angry for allowing himself to get into the position he was currently in.  Plaintiff was instructed to increase his Remeron.  (Tr. 168.)

On January 2, 2006, Dr. Croughan observed plaintiff's increased dosage of Remeron to have resulted in decreased despair. Plaintiff reported that he continued to have significant pain with decreased motivation and decreased drive.  Plaintiff expressed his desire to return to work but expressed his fear that his pain would preclude adequate functioning on a job.  Dr. Croughan instructed plaintiff to increase his dosage of Remeron and to return in four weeks.  (Tr. 167.)

On January 18, 2006, plaintiff visited Dr. O'Keefe and continued to complain of neck pain radiating to his shoulder and arm, mid-thoracic spine pain, and low back pain radiating to his buttock and thigh.  Plaintiff reported the action tremor to be adequately controlled with medication.  Physical examination showed tenderness and spasm about the cervical, thoracic and lumbar spine. Plaintiff had limitation of motion about the cervical and lumbar spine.  Straight leg raising was normal.  Mental status examination

---

[20]Remeron is indicated for the treatment of depression. Physicians' Desk Reference 2290 (55th ed. 2001).

showed plaintiff to appear mildly depressed. Laboratory testing performed that same date yielded normal results. Dr. O'Keefe reviewed the results of the October 2005 MRI's and continued in his diagnoses of plaintiff. Plaintiff was instructed to continue with his medications as prescribed and to return in six months for follow up. (Tr. 140-46.)

Plaintiff returned to Dr. Croughan on January 30, 2006, who noted plaintiff to be more animated. Plaintiff requested that his dosage of Cymbalta be changed inasmuch as he was experiencing too much diaphoresis.[21] It was noted that Dr. O'Keefe had recently started plaintiff on low dose Primidone.[22] Plaintiff was cautioned regarding his increased appetite and weight with the increased dosage of Remeron. Plaintiff was instructed to decrease his dosage of Cymbalta and to continue with Remeron as prescribed. Plaintiff was instructed to return in two weeks. (Tr. 319.)

On February 13, 2006, plaintiff reported to Dr. Croughan that the decrease in Cymbalta had resulted in decreased diaphoresis and that he experienced less dizziness upon rising. Plaintiff reported that he currently felt better than at the last office visit and that he felt Remeron was helping him not to worry so much. The possibility of doing more volunteer work was discussed. Plaintiff was instructed to continue with his medications and to

---

[21]Perspiration.  Stedman's Medical Dictionary 475 (26th ed. 1995).

[22]Primidone is used to control seizures and to treat tremors. Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682023.html>.

return in four weeks. (Tr. 320-21.)

On March 3, 2006, plaintiff visited Dr. Croughan and reported a noticeable decrease in mood with his decreased dosage of Cymbalta. Plaintiff also reported that his improvement with Remeron was somewhat short-lived. Plaintiff was instructed to continue with Remeron and to continue to decrease his dosage of Cymbalta. Lexapro[23] was prescribed. (Tr. 322.)

On March 13, 2006, plaintiff reported to Dr. Croughan that the addition of Lexapro had helped. Plaintiff complained of being tired of the pain, disability and weakened muscles. Plaintiff reported being very frustrated and of having thoughts of suicide daily, but that suicide was not an option. Plaintiff was instructed to continue with his medications. Dr. Croughan questioned whether Wellbutrin would be added in the future. (Tr. 323.)

On April 10, 2006, plaintiff reported to Dr. Croughan that he was doing better with the current mix of medications in that he did not have morbidly hopeless feelings. Plaintiff reported that he had increased pain and that increased physical activity increases his pain. Plaintiff stated that it had set in with him, psychologically, just how bad the condition of his spine was. Plaintiff was instructed to continue with his medications, with an increase in Lexapro. (Tr. 324.)

---

[23]Lexapro (escitalopram) is used to treat depression and generalized anxiety disorder. Medline Plus (last revised Feb. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603005.html>.

Plaintiff returned to Dr. Croughan on April 28, 2006, and reported that his disability hearing went well, but that neither he nor his attorney emphasized his psychiatric issues. Plaintiff continued to be upset at the prospect of being "disabled." Plaintiff reported that his feelings of deep despair were better managed but not gone. Dr. Croughan observed plaintiff to be more settled and measured overall but that he continued to have a significantly decreased mood. Plaintiff was instructed to continue with his medications with a decreased dosage of Cymbalta. (Tr. 325.)

On May 26, 2006, plaintiff reported to Dr. Croughan that he was cautiously decreasing his dosage of Cymbalta and that he preferred to continue with the medication. Plaintiff reported that he currently had a good combination of medications. Plaintiff reported that he still felt down and had mixed feelings regarding the disability process. Plaintiff reported that he felt an award was justified but felt guilty at not being able to produce. Dr. Croughan acknowledged the basic question to plaintiff was what he could do to decrease his guilt without increasing his physical pain. Occupational counseling was discussed. Plaintiff was instructed to continue with his medications and to return in four weeks for follow up. (Tr. 326.)

On July 14, 2006, plaintiff reported to Dr. Croughan that he discontinued his Cymbalta and felt much better. Plaintiff reported that he continued to have very painful musculoskeletal issues, but that he did not feel as guilty as he had in the past.

Plaintiff was instructed to continue with his current medications of Remeron and Lexapro and to follow up with Dr. Page. (Tr. 327.)

On August 8, 2006, plaintiff underwent a medical evaluation by Dr. Barry I. Feinberg. (Tr. 265-77.) Plaintiff described his back problems to Dr. Feinberg which he experienced prior to the motor vehicle accident in September 2003, and the exacerbation of such problems as well as additional problems since the accident. (Tr. 265-66, 268.) Plaintiff currently complained of pain in the cervical, thoracic and lumbar regions of the back and also in the right shoulder, hips and knees. Plaintiff reported that his pain is constant and is usually at a level six or seven on a scale of one to ten. Plaintiff reported that his pain worsens with driving and physical exertion, and is better with medication, resting in bed and using a recliner. (Tr. 266.) Plaintiff reported his current medications to be hydrocodone, Remeron, diazepam, Atenolol, carbidopa,[24] Lexapro, Celebrex, and Soma. (Tr. 267.) Neurologic examination showed muscle weakness, tremors and numbness (worse on the right side). Depression and memory loss associated with medications were also noted. Dr. Feinberg noted there to be painful joints, swelling of the legs and hands, and chronic fatigue. Dr. Feinberg noted plaintiff to be undergoing treatment for depression but not for anxiety. (Tr. 268.) Physical examination showed tenderness over the T2 vertebral spinous

---

[24]Carbidopa (Sinemet) is used to treat the symptoms of Parkinson's disease and Parkinson's-like symptoms, including tremors, stiffness and slowness of movement. Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601068.html>.

process. Reversal of the normal thoracic kyphosis between T3 to T8 was noted as well as a positive Spurling's maneuver at T8, T11, T12, and L2 with spinal hyperextension, ipsilateral rotation, reproducing typical dorsal pain. Tightness in the hamstrings was noted with left lumbar paravertebral muscle dysfunction including tightness in the quadratus, iliocostalis and longissimus lumborum muscles as well as the multifidus at L4-5 and L5/S1. Tenderness over these levels was noted with reproduction of pain and positive "Jump" sign. Tightness in the upper and middle trapezius, levator scapula and rhomboid major muscles was also noted. Trigger points were noted about the left anterior cervical musculature. Dr. Feinberg noted plaintiff to have very poor balance. Straight leg raising was positive on the left with worsening pain down the left leg, into the left buttock and thigh. Range of motion was restricted about both hips. In the sitting position, it was noted that plaintiff had dysfunction from the right C5-C6 level with tenderness over the right C5-C6 facet with positive Spurling's maneuver. Negative Spurling's maneuver for cervical radiculopathy was noted. Increased pain as well as trigger points at the L4-5 level were noted with palpation. Trigger points were also noted about the medial gastrocnemius muscle with associated weakness. Positive Gaenslen's maneuver[25] was noted in the right sacroiliac joint. Reflex and sensory testing was normal. No grip strength abnormalities were noted. (Tr. 272-73.) Upon review of the

---

[25]Positive Gaenslen's sign is pain on hyperextension of the hip with the pelvis fixed by flexion of the opposite hip. <u>Stedman's Medical Dictionary</u> 1616 (26th ed. 1995).

medical records, treatment history, physical examination, and interview of plaintiff, Dr. Feinberg opined that plaintiff

> should be permanently restricted from any lifting of greater than 15-20 pounds and any prolonged positioning of sitting, standing, or driving, which is the primary exacerbator of patient's pain. Patient would also have restrictions based upon his medications and his difficulty with concentration and memory. In addition, bending, stooping, twisting, or climbing should be restricted.

(Tr. 276.)

Dr. Feinberg concluded that plaintiff was "currently not employable at his current status." (Id.)

Plaintiff visited Dr. O'Keefe on August 11, 2006, for follow up of essential tremor, cervical spondylosis, lumbar disk disease, and restless leg syndrome. Plaintiff reported that his bilateral upper extremity action tremor was adequately controlled by his current dose of Atenolol. Plaintiff complained of neck pain radiating to his right shoulder, right arm, right forearm, and right hand. Plaintiff reported there to be no upper extremity numbness or weakness. Plaintiff also complained of low back pain radiating to his left buttock and the lateral aspect of his left thigh and leg. Plaintiff reported there to be no lower extremity numbness or weakness. Plaintiff reported that his restless leg syndrome was well controlled by his current dose of Sinemet. Physical examination showed cervical and lumbar tenderness, spasm and limitation of motion. Plaintiff was noted to have an antalgic gait. Plaintiff was instructed to continue with his medications

and to return in six months for follow up.  (Tr. 315-17.)

On September 7, 2006, Dr. O'Keefe completed a Physical Medical Source Statement for disability determinations wherein he opined that plaintiff could lift and carry one pound frequently and three pounds occasionally.  Dr. O'Keefe further opined that plaintiff could walk for a total of four hours in an eight-hour workday, but not longer than ten minutes at a time.  Dr. O'Keefe opined that plaintiff could sit for a total of four hours in an eight-hour workday, but not longer than ten minutes at a time.  Dr. O'Keefe further opined that plaintiff could not push or pull with his right upper extremity, nor push or pull with his left lower extremity.  Dr. O'Keefe opined that plaintiff could frequently balance, but could never climb, stoop, kneel, crouch, or crawl.  Dr. O'Keefe opined that plaintiff should not reach above shoulder level.  (Tr. 135-36.)  Dr. O'Keefe stated that plaintiff's impairments resulted in these limitations because:

> He has neck pain radiating to his right shoulder, arm, forearm, and hand.  He has low back pain radiating to the left buttock and the lateral aspects of the left thigh and leg. He has cervical and lumbar tenderness, spasm and limitation of motion.  Lumbar MRI on 10-11-05 shows annular tear at L4-L5.  Cervical MRI on 10-11-05 shows cervical spondylosis.

(Tr. 136.)

Plaintiff returned to Dr. Croughan on October 6, 2006, and reported that he was "not so good."  Plaintiff denied any suicidal ideations.  Plaintiff reported that he continued to have severe pain down his leg.  Plaintiff was instructed to continue

with his medications and to return in two weeks for follow up. (Tr. 328.)

On October 20, 2006, plaintiff reported to Dr. Croughan that he continued to have pain. It was noted that plaintiff no longer took Oxycontin but was taking hydrocodone as prescribed by Dr. O'Keefe. It was also noted that plaintiff took Celebrex, Soma and diazepam. Plaintiff reported that Lexapro had given him the best relief so far, and he was instructed to increase his dosage. Plaintiff was also instructed to continue with Remeron and to return in four weeks for follow up. (Tr. 329.)

On November 17, 2006, plaintiff reported to Dr. Croughan that he was very down the previous week. Discussion was had regarding plaintiff needing to reclaim his self-worth and confidence, retake personal control, and move on with his life. Plaintiff was instructed to continue with his medications. (Tr. 330.)

On December 15, 2006, plaintiff reported to Dr. Croughan that he felt better during the previous few hours but did not know why. Plaintiff reported that he was thinking of restarting his physical therapy. Plaintiff was instructed to continue with his medications and to return in four weeks. (Tr. 331.)

Plaintiff returned to Dr. Croughan on January 12, 2007, who noted plaintiff to be upset regarding his treatment in that his prescriptions were not being filled as written, others would not speak to him in any meaningful way, and that he felt he may not be functional or as responsive to treatment given his level of upset.

Plaintiff stated that he did not "want to do this (life) anymore" but denied any suicidal ideation. Dr. Croughan noted plaintiff to feel relatively hopeless and helpless. Plaintiff was instructed to continue with medications. (Tr. 332-33.)

In a letter dated February 6, 2007, Dr. Croughan set out plaintiff's diagnoses as major depressive disorder, recurrent, severe; dysthymia (characterized as "double depression"); and adjustment disorder mixed with anxiety and depressed mood. Dr. Croughan reported that plaintiff's current GAF was 45-50[26] and that plaintiff's highest GAF during the previous year was 55-60. Dr. Croughan set out his treatment history of plaintiff, including his prescribing of and adjustments to psychotropic medications:

> This medication is designed to treat depression and any associated anxiety, and also it has been found to at least partially relieve pain related to peripheral neuropathy (nerve damage). Subsequently, unremitting depression related to chronic pain has led to an increase of Cymbalta . . . and the addition of a second antidepressant Remeron[.] The Cymbalta was reduced in dosage then stopped because of side effects and overall lack of efficiency and he has since been treated with another antidepressant Lexapro[.] The Remeron is still being used but at a reduced dose . . . because of side effects at the higher dose.

(Tr. 278-79.)

In conclusion, Dr. Croughan opined:

---

[26]A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).

> Presently, and characteristic of the past 18
> months, he has shown only a partial and a very
> insufficient response to treatment of his
> severe depression, which is rooted in his
> chronic pain secondary to trauma.
>
> His prognosis is very guarded. It is my
> medical opinion based upon a reasonable degree
> of medical certainty that a very substantial
> majority, estimated at 80%, of his
> psychological disability is related to
> depression rooted in chronic pain.

(Tr. 279.)

On February 16, 2007, plaintiff reported to Dr. Croughan that the cold weather aggravated his back and leg pain. Plaintiff described a more and more depressed mood, with feelings of cycles and spirals downward and of becoming hopeless and helpless to change anything. Plaintiff denied any suicidal ideations. It was noted that plaintiff was taking Lexapro when his insurer would allow, and was also taking Remeron. Plaintiff was instructed to continue with his medications and to return in four weeks. (Tr. 334.)

In a supplemental letter dated March 15, 2007, Dr. Croughan wrote:

> Establishing Mr. Kimmel's prognosis regarding
> his psychiatric difficulties involves the
> consideration of multiple factors and issues.
> I have seen him for almost twenty-one months
> now. We have used multiple medications,
> singly and in combination and in conjunction
> with a combination of cognitive, behavioral,
> and at times insight-oriented psychotherapies
> to little avail. There have been brief
> periods when I observed a beginning anti-
> depressant response only to witness him
> falling back into the now chronic depression

> rooted in his chronic physical pain. Establishing a prognosis for the future, whether we're speaking of symptoms of depression or treatment response, is best reached on the basis of the past experiences in these areas. As such, based on my overall clinical experience, and in working with him in particular, I find his prognosis to be very poor, both with regard to the persistence of symptoms and failure to respond adequately to treatment.
>
> . . .
>
> I estimate him to be permanently partially disabled due to his chronic depression rooted in chronic pain at 85%, two-thirds of which (~55%) is attributed to the accident.

(Tr. 281-82.)

Plaintiff visited Dr. O'Keefe on March 27, 2007, for follow up. Dr. O'Keefe noted plaintiff's current medications to include Atenolol, celecoxib, Soma, diazepam, Lorcet, Sinemet, Remeron, and escitalopram. Plaintiff reported that his action tremor was well controlled by his current dose of Atenolol. Plaintiff complained of neck pain radiating to both shoulders. Plaintiff also complained of low back pain radiating to both buttocks and the lateral aspect of both thighs and both legs. Plaintiff reported that his restless leg syndrome was well controlled by his current dose of Sinemet. Physical examination showed cervical and lumbar tenderness, spasm and limitation of motion. Straight leg raising was normal. Plaintiff was noted to have an antalgic gait. Muscle strength, bulk and tone were normal in all four extremities. Finger-to-nose testing showed action tremor of both upper extremities. Laboratory tests performed that

same date were normal. Dr. O'Keefe diagnosed plaintiff with essential tremor, cervical spondylosis, lumbar disk disease, restless legs syndrome, depression, and three-cm abdominal aortic aneurism. Plaintiff was instructed to discontinue Lorcet and was prescribed Norco[27] for pain. Plaintiff was instructed to continue with his other medications and to return in six months for follow up. (Tr. 303-14.)

Plaintiff reported to Dr. Croughan on April 6, 2007, that his claim for disability had been rejected. Plaintiff expressed slight optimism regarding a lawsuit involving the motor vehicle accident. Dr. Croughan noted, however, that plaintiff remained solidly depressed and dysfunctional overall. Plaintiff also reported that his short term memory was a serious problem in that he was forgetting important dates and events. Dr. Croughan noted plaintiff to be slightly less despondent. Plaintiff was instructed to continue with his medications and to return in four weeks. (Tr. 335.)

Plaintiff returned to Dr. Croughan on May 4, 2007, who noted plaintiff to be less angry overall. Plaintiff reported having been examined by Dr. Wayne Stillings in relation to a workmen's compensation claim and that Dr. O'Keefe reviewed an MRI which showed an abdominal aortic aneurism which had increased in size. Plaintiff reported that he actually felt some relief with this in that it meant that "finally this'll be all over" at some

---

[27]Norco is another brand name for hydrocodone. See Medline Plus (last revised Oct. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html>.

point.  Plaintiff was instructed to continue with his medications and to return in four weeks.  (Tr. 336.)

On May 21, 2007, plaintiff underwent a vocational rehabilitation evaluation by James M. England, Jr., a counselor with England Company Rehabilitation Services, Inc.  Mr. England observed plaintiff to be uncomfortable physically and to have a very flat affect.  Mr. England also observed that plaintiff got up every twenty to thirty minutes during the evaluation to move around, stating that that helped his back pain somewhat.  (Tr. 283-99.)  Upon review of plaintiff's medical records, treatment history, vocational history, personal and educational background, and personal interview, Mr. England concluded:

> Mr. Kimmel is a 48-year-old gentleman placing him in the younger worker category.  He has a high school education as well as almost two years of college and classes.
>
> He certainly comes across as a bright and articulate man.
>
> Unfortunately, he also seems to have a combination of physical and emotional problems that are quite limiting to him on a day-to-day basis.
>
> Considering Dr. Feinberg's description of the man's restrictions as well as Larry's indication of his typical, day-to-day functioning I do not believe he will be able to sustain any type of work in the long run.
>
> Although he might very well be able to convince an employer to consider hiring him, I do not see how he would be able to sustain the work activity even in sedentary to light work considering the combination of his medical difficulties.  Some of these certainly seem to be pre-existing to a degree, but also appear to have been significantly worsened by the

primary injury.  As a result, it would appear
to me that his total disability is due to a
combination of pre-existing impairments
worsened by the primary injury.  Absent
significant improvement in his overall
functional ability I believe he is likely to
remain totally disabled from a vocational
standpoint and would not really benefit from
vocational rehabilitation services.

(Tr. 296-97.)

On June 2, 2007, plaintiff reported to Dr. Croughan that

he felt he was able to free himself from some anger to focus on

other issues.  Plaintiff's mood was noted to have improved.

Plaintiff was instructed to continue with his medications and to

return in four weeks.  (Tr. 337.)

Plaintiff visited Dr. Croughan on July 6, 2007, who noted

plaintiff to be very frustrated and angry at times with the ongoing

litigation regarding the motor vehicle accident.  Discussion was

had regarding the need for plaintiff to move on.  It was

recommended that plaintiff increase his dosage of hydrocodone.

Plaintiff was instructed to continue with his medications and to

return in four weeks.  (Tr. 338.)

On July 30, 2007, Dr. Croughan completed a Mental Medical

Source Statement in which he noted that he had treated plaintiff on

approximately thirty occasions during the previous two years.  Dr.

Croughan stated his psychiatric diagnoses of plaintiff to be major

depressive disorder, recurrent, severe; dysthymia; and adjustment

disorder with mixed features.  Dr. Croughan stated plaintiff's most

recent GAF to be 50, with his highest GAF in the previous year to

have been 55-60, and his lowest GAF in the previous year to have

been 45.  In the domain of Activities of Daily Living, Dr. Croughan opined that plaintiff suffered moderate limitations in his ability to function independently, to behave in an emotionally stable manner, and to maintain reliability.  Dr. Croughan further opined that plaintiff was markedly limited in his ability to cope with stress.  In the domain of Social Functioning, Dr. Croughan opined that plaintiff suffered moderate limitations in his ability to relate in social situations, and to maintain socially acceptable behavior.  Dr. Croughan further opined that plaintiff was markedly limited in his ability to interact with the general public, and to accept instructions and respond to criticism.  In the domain of Concentration, Persistence or Pace, Dr. Croughan opined that plaintiff suffered moderate limitations in his ability to understand and remember simple instructions, to make simple work-related decisions, to maintain regular attendance and be punctual, to sustain an ordinary routine without special supervision, and to work in coordination with others.  Dr. Croughan further opined that plaintiff was markedly limited in his ability to complete a normal workday and workweek without interruptions from symptoms, to maintain attention and concentration for extended periods, to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond to changes in a work setting.  Dr. Croughan opined that plaintiff had suffered one or two episodes of decompensation within the previous year.  Dr. Croughan further opined that plaintiff had a substantial loss of ability to respond appropriately to supervision, co-workers and

usual work situations; as well as a substantial loss of ability to deal with changes in a routine work setting. Dr. Croughan stated that plaintiff suffered the described limitations at the described severity since approximately 2004. (Tr. 341-45.)

### IV. The ALJ's Decision

The ALJ found that plaintiff met the disability insured status requirements of the Social Security Act on February 9, 2005, and continued to meet them through the date of the decision. The ALJ also found that plaintiff had not engaged in substantial gainful activity since February 9, 2005. The ALJ found plaintiff to have degenerative disc disease of the cervical, thoracic and lumbar spine, but that he did not have an impairment or combination of impairments which met or medically equaled any impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff's allegations of impairment-related limitations to be credible only to the extent of plaintiff's residual functional capacity (RFC) as determined by the ALJ. The ALJ found plaintiff able to perform work-related activities involving lifting and/or carrying up to fifty pounds, with frequent lifting of not more than twenty-five pounds; standing and/or walking for up to two hours in an eight-hour workday; and sitting for at least six hours in an eight-hour workday. The ALJ found plaintiff to have non-exertional impairments in that his medication regimen precluded him from working at unprotected heights or around dangerous moving objects, and that he would need to avoid exposure to extreme cold and vibration to his body. The ALJ determined that plaintiff's past

relevant work as a loan officer, security consultant and work program teacher was not precluded by plaintiff's limitations as set out above. Inasmuch as plaintiff could perform his past relevant work, the ALJ determined plaintiff not to be under a disability at any time through the date of the decision. (Tr. 21-22.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits under the Social Security Act, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged

in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff argues that the ALJ erred by according more weight to the opinion of non-examining physicians than to the opinions of

plaintiff's treating physicians and in failing to accord substantial weight to the opinions of Drs. O'Keefe and Croughan, plaintiff's treating physicians.  Plaintiff also contends that in determining plaintiff's RFC, the ALJ failed to consider the effect plaintiff's pain and depression had on plaintiff's ability to perform work.

Inasmuch as the determination in this case turns on the extent to which plaintiff suffers limitations as a result of his mental impairment, the undersigned will first address plaintiff's claims as they relate to his alleged mental impairment.

At Step 2 of the sequential evaluation, the ALJ determined plaintiff's mental impairment not to be severe, finding that there was no evidence that plaintiff had more than mild limitations relating to such an impairment.  (Tr. 19.)  Plaintiff contends that the only evidence of record to support the ALJ's finding is the Mental-RFC checklist completed by a non-treating, non-examining psychologist wherein she opined in October 2005 that plaintiff's mental impairment was not severe.  Plaintiff argues that the ALJ erred by according significant weight to the opinion of this non-examining psychologist and by failing to accord substantial weight to the opinion of plaintiff's treating psychiatrist, Dr. Croughan.  Plaintiff's argument is well taken.

In his written decision, the ALJ acknowledged plaintiff's treatment by Dr. Croughan, stating that plaintiff visited Dr. Croughan on five occasions from September through January 2, 2006. (Tr. 16.)  The ALJ found it significant that pain management

specialist Dr. Page observed plaintiff in May 2005 to have a normal affect and an appropriate mood, and that plaintiff reported to Dr. Page in September 2005 that his counseling with Dr. Croughan was helping him "quite a bit." (Tr. 19.) The ALJ also specifically noted plaintiff's complaint to Dr. Croughan in January 2006 was of his fear that his pain would preclude him from working, and that there was no expressed fear by plaintiff that any significant depressive symptoms would preclude work. (Id.) On this evidence, the ALJ found plaintiff's mental impairment not to be severe.

Although at the time of his decision, the ALJ did not have before him all of the medical evidence which currently appears in the record, including Dr. Croughan's treatment notes and reports subsequent to January 2, 2006, the ALJ's summary of plaintiff's mental health history and treatment was nevertheless incomplete with respect to the evidence that was before him. When such evidence is coupled with the additional evidence submitted to and considered by the Appeals Council, it cannot be said that the ALJ's determination that plaintiff's mental impairment was not severe is supported by substantial evidence on the record as a whole. See Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994) (Court must review evidence considered by Appeals Council and determine "whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision.").

In his written decision, the ALJ noted plaintiff to have reported to Dr. Page in September 2005 that his counseling had

helped "quite a bit" and to have expressed fear to Dr. Croughan in January 2006 regarding his *physical* ability to work as opposed to his mental ability. The evidence which was before the ALJ at the time of his decision, however, shows plaintiff's mental health history not to have been so cursory: As early as March 2004, plaintiff was prescribed psychotropic medications for the treatment of his diagnosed condition of depression, with such medications being monitored by his treating physician, Dr. O'Keefe. Thereafter, Dr. O'Keefe continued with this diagnosis and treatment, and in October 2004, when plaintiff reported that he was troubled by his depression, Dr. O'Keefe determined to increase plaintiff's dosage of psychotropic medication. Dr. O'Keefe's diagnosis of depression continued through February and May 2005 and plaintiff continued to be prescribed psychotropic medication for his condition. Although, as noted by the ALJ, pain management specialist Dr. Page observed plaintiff in May 2005 to have an appropriate mood with no signs of depression, Dr. Page nevertheless referred plaintiff at that time for psychiatric evaluation noting the interdependence of chronic pain and depression. Indeed, throughout June, July and August 2005, Dr. Page observed plaintiff to be "profoundly depressed" and noted that plaintiff's "major depression" was not "optimally controlled." The ALJ did not address these observations in his decision. Beginning in July 2005, plaintiff began psychiatric treatment with Dr. Croughan (upon referral from Dr. Page) and underwent such treatment on eleven separate occasions through January 2, 2006. Throughout these

initial seven months of psychiatric treatment, Dr. Croughan continually treated plaintiff's diagnosed depression with psychotherapy as well as additional and continued prescriptions of psychotropic medications, with adjustments made thereto given plaintiff's transient response to such treatment. In the meanwhile, Dr. Page continued to observe plaintiff to be depressed and indeed opined in September 2005 that plaintiff needed aggressive treatment for his depression. Dr. O'Keefe likewise continued to observe plaintiff to be depressed during this period. In his decision, the ALJ did not address these recorded observations made by plaintiff's treating physicians.

The evidence received subsequent to the ALJ's decision and reviewed by the Appeals Council shows Dr. Croughan's continued treatment of plaintiff for depression, including the addition of new psychotropic medications and counseling regarding plaintiff's thoughts of suicide, hopelessness and despair. Significantly, Dr. Croughan observed plaintiff's sense of helplessness to revolve around plaintiff's inability to work. Despite isolated episodes of improvement, Dr. Croughan continually observed plaintiff to have a decreased mood, to be depressed, and to have feelings of hopelessness and helplessness. In February and March 2007, Dr. Croughan opined that plaintiff's chronic depression, which was unresponsive to treatment, constituted a permanent, partial disability at eighty-five percent. In July 30, 2007, after thirty separate treatment sessions with plaintiff over a two-year period, Dr. Croughan opined that plaintiff's mental impairment resulted in

moderate to marked limitations in plaintiff's ability to engage in activities of daily living; moderate to marked limitations in plaintiff's ability to engage in social functioning; and moderate to marked limitations in plaintiff's ability to function with concentration, persistence or pace. Dr. Croughan also opined that plaintiff had suffered one or two episodes of decompensation within the previous year, and that plaintiff had suffered such limitations since 2004.

In light of all of the evidence of record in relation to plaintiff's mental impairment, including the observations of plaintiff's treating physicians and the reports of plaintiff's treating psychiatrist as to the severity of plaintiff's limitations caused thereby, the ALJ's decision that plaintiff's mental impairment is not severe is not supported by substantial evidence on the record as a whole. Other than the October 2005 Mental-RFC checklist completed by the reviewing, non-examining psychologist, there is no evidence to support the ALJ's finding that plaintiff suffers no more than mild limitations on account of his mental impairment. An opinion from a non-treating, non-examining physician who merely reviews reports to form an opinion is not medical evidence and, when considered alone, ordinarily does not constitute substantial evidence upon which an ALJ may base his decision. <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000). Nor does there appear to be a basis upon which to discount the observations and reports of plaintiff's treating psychiatrist regarding plaintiff's mental impairment. <u>See</u> 20 C.F.R. §

404.1527(d)(2).

To the extent the ALJ also relied on isolated statements that plaintiff had improved to find plaintiff's mental impairment not be severe, a review of the record as a whole shows such "improvements" to be sporadic and short-lived. In the context of a comprehensive mental health treatment program wherein the treating physician has not discharged the claimant from treatment and requires the claimant to see him frequently, and where other physicians have rendered opinions regarding the claimant's limited ability to engage in work-related activities, isolated and limited improvements in a chronically depressive state are not inconsistent with a finding of disability. Hutsell v. Massanari, 259 F3d 707, 712-13 (8th Cir. 2001). The record here is replete with evidence regarding plaintiff's chronic depression, his inability to respond to treatment, and his limitation of function on account of the impairment. Indeed, in July, August and September 2005, plaintiff's pain management specialist observed that plaintiff needed aggressive treatment for his depression and opined that plaintiff's chronic pain could not be improved without control of plaintiff's depressive condition. As reported by plaintiff's treating psychiatrist in February and March 2007, adequate control of plaintiff's depression had never been obtained despite ongoing treatment and therapy.

The burden of showing a severe impairment at Step 2 of the sequential evaluation rests with claimant, and the burden is not great. Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir.

2001); see also Gilbert v. Apfel, 175 F.3d 602, 604-05 (8th Cir. 1999) (court to apply "cautious standard" at Step 2 of evaluation process). In light of the evidence set out above, it cannot be said that the Commissioner's determination at Step 2 of the evaluation process that plaintiff has failed to meet his burden of establishing that his mental impairment constitutes a severe impairment is supported by substantial evidence on the record as a whole.[28]

The failure to properly evaluate plaintiff's mental impairment at Step 2 of the sequential evaluation necessarily influenced the ALJ's analysis at subsequent steps inasmuch as the decision that plaintiff's mental impairment was not severe essentially removed such impairment from further consideration, including considering the effects of plaintiff's depression in combination with the effects of his physical impairments. See Pratt v. Sullivan, 956 F.2d 830, 835-36 (8th Cir. 1992). As such, the undersigned is not in a position to determine whether such subsequent findings by the ALJ were erroneously made, including the ALJ's credibility determination and RFC assessment. Id. at 836 (failure to properly evaluate mental impairment resulted in failure to examine possibility that a psychological impairment aggravates the claimant's perception of pain); Delrosa v. Sullivan, 922 F.2d

---

[28]Although not set out in the ALJ's decision nor addressed by the parties in their respective briefs, the undersigned is aware of the additional sequential evaluation process the Commissioner must undergo in evaluating mental impairments. 20 C.F.R. § 404.1520a. Upon remand, the Commissioner should be mindful of the requirement that specific findings be made in this process. 20 C.F.R. § 404.1520a(e)(2).

480, 485-86 (8th Cir. 1991) (on remand, ALJ advised to consider aggravating factor posed by possibility that claimant's perception of pain is exacerbated by psychological impairment).  Likewise, a proper evaluation of plaintiff's mental impairment may influence the determination of whether plaintiff can perform his past relevant work, e.g., Groeper v. Sullivan, 932 F.2d 1234, 1238-39 (8th Cir. 1991); and, if not, whether the additional testimony of a vocational expert is required to assist in the determination as to whether plaintiff can perform other work as it exists in the national economy, see Beckley v. Apfel, 152 F.3d 1056, 1059-60 (8th Cir. 1998) (depression to be considered by vocational expert in determining a claimant's ability to perform work); Pratt, 956 F.2d at 836 (failure to include mental impairment in hypothetical questions posed to vocational expert rendered those questions defective).  Although the undersigned is aware that upon remand, the ALJ's decision as to non-disability may not change after properly undergoing the required analysis regarding plaintiff's mental impairment, see Pfitzer v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999), the determination after proper analysis nevertheless is one which the Commissioner must make in the first instance.[29]

---

[29]The undersigned notes that in his decision, the ALJ appeared to give great weight to the opinions of a non-treating, non-examining medical consultant and non-treating, non-examining psychologist over those of plaintiff's treating neurologist, pain management specialist, and psychiatrist.  To the extent the Commissioner, upon remand, may continue to give more weight to the cursory opinions of non-examining consultants over that of treating physicians, the Commissioner should be prepared to provide reasons for according such weight and discounting the opinions of treating specialists.  See 20 C.F.R. § 404.1527(d).

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be reversed and that this cause be remanded to the Commissioner for further proceedings.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **December 15, 2008.** Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_

UNITED STATES MAGISTRATE JUDGE

Dated this  _3rd_  day of December, 2008.